[Cite as *State v. Carpenter*, 2020-Ohio-5295.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOSHUA E. CARPENTER AKA BRITTANY LEANNA CARPENTER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 MO 0010**

---

Criminal Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2018-278

**BEFORE:**
Gene Donofrio, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed

---

*Atty. Dave Yost*, Ohio Attorney General and *Atty. Andrea Boyd,* Assistant Attorney General, 150 East Gay Street, 16th Floor, Columbus, Ohio 43215, for Plaintiff-Appellee, and

*Atty. Addison Spriggs*, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

Dated:
November 6, 2020

Donofrio**, J.**

**{¶1}** Defendant-appellant, Joshua Carpenter aka Brittany Carpenter[1], appeals from a Monroe County Common Pleas Court judgment convicting him of six counts of rape, following a jury trial.

**{¶2}** Appellant is married to Tabitha. They have a daughter together, A.C., who was born in 2004. When A.C. was four years old, appellant began a relationship with Charlotte. Appellant left Tabitha and moved in with Charlotte and her daughter G.B., who was born in 2009. Appellant and Charlotte had a son together in 2011.

**{¶3}** A.C. had regular weekend and summer visitation with appellant at Charlotte's house. A.C. last visited with appellant at Charlotte's house in February 2016. In late 2016, when she was in the sixth grade, A.C. disclosed to her school guidance counselor that appellant had been sexually abusing her since she was five years old.

**{¶4}** Appellant broke up with Charlotte and moved in with his new girlfriend, Gina in 2016. G.B. and her brother visited appellant at Gina's house on a few occasions. After a visit in 2016, G.B. returned home to Charlotte with a gash on her side and bruises on her rib cage. G.B.'s brother reported to Charlotte that appellant had whipped G.B. Charlotte did not allow her children any further visitation with appellant after that point. G.B. later disclosed to Charlotte's girlfriend that appellant had sexually abused her.

**{¶5}** A Monroe County Grand Jury indicted appellant on six rape charges, all first-degree felonies. A.C. was the alleged victim in counts one through four. G.B was the alleged victim in counts five and six. Counts one, two, and five charged appellant with violating R.C. 2907.02(A)(2), use of force or threat of force. Counts three, four, and six charged appellant with violating R.C. 2907.02(A)(1)(b), victim less than thirteen years of age. The grand jury also indicted appellant on a sexually violent predator specification. The matter proceeded to a jury trial.

---

1 Appellant is transgender and his legal name has been changed to "Brittany." But all of the court filings are captioned with his birth name of "Joshua." In his appellate brief, appellant makes note that the filings in this case will utilize his birth name and will also use male pronouns. For this reason, this opinion will do so as well.

{¶6}   The jury heard testimony from numerous witnesses including both victims, their mothers, and appellant.  It then found appellant guilty of all charges and found appellant to be a sexually violent predator pursuant to the specification.

{¶7}   The trial court subsequently held a sentencing hearing.  The court found that counts one, two, and five merged with counts three, four, and six for sentencing purposes.  The court sentenced appellant to three mandatory terms of life in prison without parole to be served concurrently.

{¶8}   Appellant filed a timely notice of appeal on May 2, 2019.  He now raises three assignments of error.

{¶9}   Appellant's first assignment of error states:

THE TRIAL COURT ERRED WHEN IT ALLOWED A BIASED JUROR TO SIT ON MR. CARPENTER'S JURY.

{¶10}   In this assignment of error, appellant takes issue with the seating of Juror C.

{¶11}   Juror C. is a school principal.  (Tr. 118).  When discussing appellant's presumption of innocence, Juror C. indicated that he could follow the law and not make any determinations until after he received all of the evidence and the court had instructed on the law.  (Tr. 134-135).  But further into voir dire, the following exchanges took place.

{¶12}   During one exchange, defense counsel stated, "my client can sit here and not present any evidence at all.  Would you have a problem with that?"  (Tr. 136-137).  Juror C. responded, "I can answer that by saying you know, fifty-fifty right now, but I can be persuaded more so towards the victims that are minors."  (Tr. 137).  Juror C. also commented that "sometimes kids might be more truthful than adults."  (Tr. 138).

{¶13}   During another exchange, defense counsel asked Juror C. if he would hold it against appellant if he did not testify.  Juror C. responded, "I guess I would ask why wouldn't he testify, if he's innocent?"  (Tr. 139-140).

{¶14}   Finally, defense counsel asked Juror C., "Ultimately, that gets to the question as to whether or not you can follow the law that the Judge gives you, given his [appellant's] absolute right not to testify."  (Tr. 142).  Appellant replied, "So, in that case,

yeah, I may not be able to follow the law * * * 'Cause I'm assuming guilty if I can't see and listen to this person." (Tr. 142).

{¶15} Appellant argues that allowing Juror C. to remain on the jury after he informed counsel and the court that he could not follow the law was plain error.

{¶16} Appellant acknowledges that his counsel did not object to the seating of Juror C. Since appellant did not object to the seating of Juror C., we must review this assignment of error for plain error. Plain error should be invoked only to prevent a clear miscarriage of justice. *State v. Underwood*, 3 Ohio St.3d 12, 14, 444 N.E.2d 1332 (1983). Plain error is one in which but for the error, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶17} A prospective juror may be challenged for cause if he or she demonstrates bias toward the defendant or the state. R.C. 2945.25(B); Crim.R. 24(C)(9). Moreover, pursuant to R.C. 2313.17(B)(9), a potential juror may be challenged for cause if the person "discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court."

{¶18} Appellant first takes issue with Juror C.'s statements that he was "fifty-fifty right now" but that he could "be persuaded more so towards victims that are minors" and "sometimes kids might be more truthful than adults." What appellant fails to mention, however, is that immediately after making these statements Juror C. then stated, "I need to hear some facts, before I would be swayed either way." (Tr. 137). Thus, Juror C. indicated that he would listen to the evidence in the case before he would decide whether to believe the defense or the prosecution.

{¶19} Appellant also takes issue with Juror C.'s statements suggesting he might not believe appellant was not guilty if appellant did not testify in his own defense.

{¶20} There is no plain error with this issue, however, because appellant took the stand and testified in his defense. Juror C. indicated that he would wonder why appellant would not take the stand if he was innocent. (Tr. 139-140). Juror C. also indicated that he may not be able to follow the law if appellant did not testify and he could not see appellant and listen to him. (Tr. 142). But appellant did testify. So Juror C.'s statements regarding what he might think or that he might not be able to follow the law if appellant did not testify are irrelevant, especially in light of a plain error analysis.

Case No. 19 MO 0010

{¶21}    Accordingly, appellant's first assignment of error is without merit and is overruled.

{¶22}    Appellant's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT ALLOWED EXPERT TESTIMONY FROM A STATE'S WITNESS WHO WAS NOT FIRST QUALIFIED AS AN EXPERT, AND WHO DID NOT PREPARE A REPORT AT ALL, LET ALONE PROVIDE ONE TO THE DEFENSE IN DISCOVERY.

{¶23}    In this assignment of error, appellant contends the state was required to, and failed to, provide him with a copy of an expert report from social worker Pamela Spencer.  Spencer conducted a forensic interview of A.C.

{¶24}    Appellant argues that Spencer testified as an expert in conducting forensic interviews of children who alleged sexual assault.  As such, appellant asserts, the state was required to provide him with an expert report from Spencer prior to trial.  He contends Spencer did not merely recite the circumstances of her interview with A.C.  Instead, she gave opinions and judgments that only an expert in child forensic interviewing could give.  For instance, Spencer offered the opinions that A.C. was not coached and that A.C.'s self-harming was an indicator of sexual abuse.  Moreover, Spencer testified as to her training and qualifications to offer such opinions.

{¶25}    Appellant asserts the trial court should not have allowed Spencer to testify since she did not file a report and provide a copy to him before trial.  Alternatively, he contends the trial court should have declared a mistrial after Spencer's testimony.  He asserts the trial court's failure to do so constituted plain error because Spencer's testimony bolstered A.C.'s testimony that appellant raped her, which was not otherwise supported by any other evidence.

{¶26}    Once again, appellant acknowledges that his counsel did not object to Spencer's testimony or the lack of an expert report.  Thus, this matter will be reviewed for plain error.

{¶27}    Crim.R. 16(K) provides:

Case No. 19 MO 0010

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

Thus, pursuant to the rule, Spencer was only required to prepare and submit a report if she was testifying as an expert. If she did testify as an expert, the fact that the state did not provide appellant with her report, could preclude her expert testimony at trial.

**{¶28}** Therefore, Appellant urges this court to examine whether Spencer actually testified as an expert. The state contends she testified as a lay witness.

**{¶29}** Pursuant to Evid.R. 702, a witness may testify as an expert if three conditions are met: (1) the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (3) the testimony is based on reliable scientific, technical, or other specialized information. "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

**{¶30}** As the Second District has pointed out:

The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw. *Id.* at ¶ 19. However, as recognized by the Supreme Court of Ohio, courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. *State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001). "Although

these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience." (Footnote omitted.) *Id.* at 296–297, 744 N.E.2d 737; see also *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 107 (2d Dist.) (police detective could testify about typical behavior of children in child abuse cases based on his training and experience in such cases); *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, 2013 WL 6576714, ¶ 77.

*Hetzer-Young v. Elano Corp.*, 2d Dist. Greene No. 2015-CA-38, 2016-Ohio-3356, ¶ 44.

**{¶31}** In this case, the state did not ask the trial court to qualify Spencer as an expert. Thus, the issue was never before the court.

**{¶32}** Spencer is a social worker and forensic interviewer at the Stark County Department of Job and Family Services (SCDJFS). She testified that in order to receive her position she earned a bachelor's degree in sociology. (Tr. 466). While employed at SCDJFS, she completed 30 hours of training pertaining to child welfare and forensic interviewing. (Tr. 466-467). This training included multiple classes on forensic interviewing during the course of her employment. (Tr. 468-469).

**{¶33}** Spencer then testified regarding her interview with A.C. Spencer stated that while she was talking with A.C., she notice several verbal and non-verbal clues common in children who have been abused. (Tr. 473). She noted A.C. was soft spoken and giggled a little bit. (Tr. 473). She also observed that A.C. appeared embarrassed at times and didn't maintain eye contact. (Tr. 473-474).

**{¶34}** Spencer testified that during the interview, A.C. disclosed that appellant touched her inappropriately and vaginally raped her many times over a five-to-six year period. (Tr. 478-479). A.C. told Spencer that she would tell appellant to stop, but he refused. (Tr. 479). She also told Spencer that appellant told her she would be in trouble if she told her mom. (Tr. 479). A.C. denied oral and anal sex to Spencer. (Tr. 481-482). Spencer testified that it was not uncommon for children to later disclose more information

Case No. 19 MO 0010

over time. (Tr. 482-483). She also testified that A.C. talked about cutting herself and punching herself. (Tr. 488-489). Spencer stated that self-harm is an indicator of sexual abuse. (Tr. 489).

**{¶35}** The prosecutor asked Spencer to answer several questions based on her "education," "training," and/or "experience." (Tr. 477, 482, 483). Spencer also testified that her testimony was based on her observations of A.C. and what A.C. told her in addition to her forensic interview training and her education. (Tr. 500).

**{¶36}** Clearly, Spencer's testimony as to what A.C. disclosed to her during the interview was that of a lay witness. She was simply relating facts to the jury as to what A.C. said based on her own observations.

**{¶37}** The issue concerns other testimony that is alleged to stray into the territory of an expert witness.

**{¶38}** The prosecutor asked Spencer if disclosure over time, as opposed to all at the same time, was to be expected based on her "education and your training and your experience." (Tr. 477). The prosecutor followed up by soliciting testimony that Spencer had conducted over one thousand forensic interviews. (Tr. 477).

**{¶39}** Later, Spencer testified that A.C. did not disclose anal or oral sex during her interview. (Tr. 481). The prosecutor then asked her, "is that something that is based on your education and training and experience, would that be inconsistent if she later said that it did happen?" (Tr. 482). To which Spencer replied "no." (Tr. 482).

**{¶40}** In discussing how children remember things, the prosecutor asked Spencer, "Do you think that kids based on your education, training and experience, remember things based on other significant events?" (Tr. 483).

**{¶41}** Regardless of whether Spencer offered some expert opinions, there was no objection, and for the reasons explained below, the admission of the contested testimony was not an obvious error that was outcome determinative. As explained in the prior assignment of error, plain error cannot be recognized unless the error is obvious and the outcome of the trial would have been different. *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The reviewing court's "discretionary" power to recognize plain error must be exercised "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*

Case No. 19 MO 0010

**{¶42}** In addition, the Ohio Supreme Court very recently addressed the issue of whether the admission of expert opinion testimony that was not set forth in a written report is reversible error and found harmless error *in a case where there was an objection*. In *State v. Boaston*, Slip Opinion 2020-Ohio-1061, Boaston was convicted of murdering his ex-wife.

**{¶43}** More than a year prior to trial, the state provided the deputy coroner's written autopsy report to the defense. *Id*. at ¶ 38. The report detailed the deputy coroner's findings, which included her determinations as to the appearance and weight of the contents in the victim's stomach, but did not include her opinion as to the time of death based on those stomach contents. *Id*. The deputy coroner then met with defense counsel 19 days before trial. *Id*. at ¶ 40. At this meeting, based on the findings contained in the autopsy report, she shared her opinion as to the victim's time of death and her opinion that the shape of the abrasion under the victim's chin was consistent with the shape of the buckle on a glove that had been collected from Boaston. *Id*. Defense counsel "suggested" that the state supply a supplemental report, but the state did not provide one. *Id*.

**{¶44}** At trial, defense counsel moved to exclude the deputy coroner's opinion testimony as to the time of death and the glove-buckle comparisons because the deputy coroner failed to provide a written report summarizing these opinions at least 21 days prior to trial, as required by Crim.R. 16(K), or because she failed to supplement her report following defense counsel's meeting with her. *Id*. at ¶ 41. The trial court overruled the objection and permitted the testimony. *Id*. The court of appeals upheld the trial court's judgment based on the trial court's broad discretion in regulating the admission of evidence and on waiver. *Id*.

**{¶45}** On appeal to the Ohio Supreme Court, Boaston argued the state's failure to supply a written report providing the deputy coroner's opinions and "scientific reasoning" that the victim died within one to two hours after eating and that the bruise under her chin was consistent with Boaston's glove violated Crim.R. 16(K). *Id*. at ¶ 42. The state, on the other hand, argued that Crim.R. 16(K) only requires "a written report summarizing 'the expert witness's testimony, findings, analysis, conclusions, or opinions' " and does not require "scientific reasoning." *Id*. at ¶ 43. Alternatively, the state argued

that even if it violated Crim.R. 16(K), the rule is subject to the requirements of Crim.R. 52. *Id.* Thus, any error in the admission of an expert opinion not specifically stated in the deputy coroner's written report would only be reversible if the error was prejudicial to Boaston's substantial rights. *Id.*

**{¶46}** The Court began by analyzing Crim.R. 16, noting that the Rule was amended in 2010 "in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial." *Id.* at ¶ 44. As part of the amendment, Crim.R. 16(K) was adopted, which requires that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial. *Id.* at ¶ 46.

**{¶47}** The Court went on then to determine whether Crim.R. 16(K) required the exclusion of the deputy coroner's testimony that went beyond the scope of her written autopsy report. *Id.* at ¶ 46. The Court noted that the deputy coroner's unwritten opinions did not affect Boaston's defense strategy, no continuance was requested, and defense counsel thoroughly cross-examined the deputy coroner as to her time-of-death and glove-buckle-analysis opinions. *Id.* at ¶ 50. Thus, no unfair surprise occurred. *Id.* But the Court continued its analysis.

**{¶48}** The Court went on to find:

> The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial." (Emphasis added.) Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery *not inconsistent with this rule.*" (Emphasis added.) And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

*Id.* at ¶ 55. Thus, the Court found that the deputy coroner's opinions regarding the time of death and buckle abrasion, should have been set forth in a report or supplemental report pursuant to Crim.R. 16(K), which would have placed Boaston on formal notice of this substantive opinion testimony and given him the opportunity to seek other expert-

opinion testimony on these issues. *Id.* at ¶ 56-57. As such, the Court determined that the state violated Crim.R. 16(K) by failing to provide a written report that contained the deputy coroner's opinions on these topics and the trial court erred in allowing the opinion testimony that went beyond the scope of the supplied expert report. *Id.* at ¶ 58.

**{¶49}** But the Court did not end its analysis there. Having found that the admission of this evidence was error, it moved on to consider whether that error was harmless. *Id.* at ¶ 59.

**{¶50}** The Court found the error was harmless because Boaston was not prejudiced by the admission of the evidence. *Id.* at ¶ 64. It noted that the evidence was not essential to the state's prosecution. *Id.* It also found that even without the deputy coroner's opinion testimony regarding the time of death and the glove-buckle comparison, the remaining evidence overwhelmingly established Boaston's guilt beyond any reasonable doubt. *Id.* at ¶ 65. The Court concluded: "We hold that it is error to admit expert opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K). In this case, however, the trial court's admission of testimony that went beyond the scope of the expert's written report was harmless error." *Id.* at ¶ 70.

**{¶51}** Likewise, in this case, any error in the trial court's admission of Spencer's testimony without a report was harmless. Disregarding the parts of Spencer's testimony alleged to contain expert opinions, the evidence against appellant in this case was substantial.

**{¶52}** A.C. testified that appellant began sexually abusing her after he and her mother (Tabitha) split up and appellant moved in with his girlfriend (Charlotte). (Tr. 275). She was five years old at the time and about to start kindergarten. (Tr. 275-276). She described the first time the abuse occurred. (Tr. 276-281). A.C. testified that they were sitting on the bed watching the movie *It* while Charlotte was grocery shopping. (Tr. 276-277). Appellant removed her pants and his own pants. (Tr. 278-279). A.C. stated that appellant then vaginally raped her. (Tr. 279-280). She stated that it "hurt incredibly awful" and she asked him to stop but he did not. (Tr. 280-281). When it was over, appellant told A.C. not to tell anyone. (Tr. 282).

{¶53} A.C. went on to testify that appellant repeatedly raped her whenever she visited him. (Tr. 284-295). The abuse included vaginal and anal rape in addition to oral sex. (Tr. 295). A.C. testified she never told her mother about the abuse because she was scared. (Tr. 294, 299). She stated that she obeyed appellant because he was her dad. (Tr. 298-299). A.C. testified that the last time appellant raped her was on February 14, 2016, when she was 11 years old. (Tr. 306, 311). She remembered this day because it was the last time she visited appellant at Charlotte's house. (Tr. 306).

{¶54} A.C. also testified that when she was ten years old, her mother had her see a counselor because she was cutting herself. (Tr. 312). A.C. stated that close to Christmas 2016, she finally disclosed to her school counselor that appellant had been raping her. (Tr. 317). She stated she was going to have to visit appellant over Christmas break and she was trying to put a stop to the abuse. (Tr. 317-318).

{¶55} A.C. additionally testified about appellant being transgender. She stated that she grew up with appellant being "trans" and that she loved him regardless of the fact that he wanted her to call him "Mom" or "Brittany." (Tr. 324-325).

{¶56} A.C.'s mother, Tabitha, testified that after she and appellant broke up, A.C. visited with appellant every other weekend. (Tr. 375). A.C.'s visits with appellant continued until third or fourth grade. (Tr. 380). Tabitha noticed marks on A.C.'s arms and came to learn from A.C. that she was cutting herself. (Tr. 381-382). Tabitha also noticed that A.C. did not want to go to visit appellant. (Tr. 383). Tabitha took A.C. to counseling to deal with the cutting. (Tr. 384-385).

{¶57} Tabitha stated that in December 2016, she received a call from the school counselor. (Tr. 386). She went to A.C.'s school and A.C. then disclosed to her that appellant had been raping her. (Tr. 386). She stated that thereafter she took A.C. for interviews and a checkup. (Tr. 387). Tabitha also stated that after her disclosure, A.C. learned appellant had been abusing G.B. too. (Tr. 390). She testified that A.C. blamed herself and thought that if she would have come forward sooner she would have been able to spare G.B. from appellant's abuse. (Tr. 390).

{¶58} A.C.'s school counselor testified that on December 22, 2016, A.C. disclosed to her that appellant had been raping her since she was five. (Tr. 453-454). The counselor stated that A.C. was shaking and in tears and also confided that she was

having suicidal thoughts. (Tr. 454). The counselor immediately contacted children's services and Tabitha. (Tr. 455-456). She stated that Tabitha came right away and A.C. then disclosed to her what appellant had done. (Tr. 457).

**{¶59}** Retired Police Chief Chuck Hamilton investigated this matter. He interviewed appellant. Chief Hamilton informed appellant of the allegations A.C. had made. (Tr. 618). He asked appellant if he believed A.C. to be a truthful person. (Tr. 618). Appellant responded that she was. (Tr. 618). At no point did appellant call A.C. a liar. (Tr. 622). Chief Hamilton also spoke with A.C. She told the chief that appellant placed his penis in her vagina and that he did so whenever she visited him. (Tr. 627). She indicated that the last time this happened was in February 2016. (Tr. 627).

**{¶60}** Megan Dahlheimer is the pediatric nurse practitioner who examined A.C. Dahlheimer testified that it is very common for children to not report sexual abuse immediately. (Tr. 687-688). She stated that A.C.'s physical examination was normal, which is very common in a sexual abuse case. (Tr. 692). This is due in part because A.C.'s exam did not take place until almost a year after the last disclosed incident of abuse. (Tr. 692-693). Dahlheimer also stated that Tabitha had informed her that A.C. began menstruating at age seven. (Tr. 696). Dahlheimer testified that early onset of menstruation can be a sign of sexual abuse. (Tr. 696-697). Additionally, she stated that cutting is a red flag for abuse as is suicidal ideation, which A.C. disclosed to her. (Tr. 698). At the conclusion of her exam, Dahlheimer's diagnosis was consistent for child sexual abuse. (Tr. 702).

**{¶61}** G.B. was nine when she testified. (Tr. 411). She testified that appellant touched her in a place he was not supposed to touch her. (Tr. 414). G.B. stated that it happened when her mom was at work. (Tr. 414). She said this occurred when she was in the first or second grade. (Tr. 415). She stated that this would occur on the couch in the living room. (Tr. 421-422). G.B. then elaborated and testified that appellant touched her "pee-pee" with his hands. (Tr. 417). She stated that she told him not to do that because her mom would get really mad but that he did it anyway. (Tr. 417). Appellant then told G.B. not to tell her mom. (Tr. 418). She also testified that appellant put his mouth on her "pee-pee." (Tr. 428-429). G.B. stated that appellant also did these thing when she visited him (after he had moved out of Charlotte's house). (Tr. 432-433). She

then finally disclosed to Jamie (her mom's friend) and Charlotte (her mom) what appellant had been doing to her. (Tr. 431). G.B. also testified that she "didn't even know [A.C.] was involved in this" until she heard her mom talking on the phone about the night before the trial. (Tr. 441-442).

**{¶62}** G.B. also testified that she had a scar on her side from appellant hitting her with a belt. (Tr. 418). And she testified that appellant would lock her in the basement. (Tr. 419).

**{¶63}** Charlotte testified that she began a relationship with appellant in 2010, when G.B. was a year old. (Tr. 516). Appellant moved in with her and the two had a son together in 2011. (Tr. 518). Charlotte stated that A.C. came and stayed with them every other weekend from the time she was five. (Tr. 522). She testified that appellant would care for the children while she was at work. (Tr. 523).

**{¶64}** After she and appellant broke up and appellant moved out, Charlotte's girlfriend Jamie moved in with her. (Tr. 544). Charlotte testified that Jamie called her at work to tell her that G.B. had disclosed to her that appellant had been abusing her. (Tr. 543-544). Charlotte then asked G.B. what had happened and G.B. disclosed the abuse to her. (Tr. 545). Charlotte filed a police report. (Tr. 545). Charlotte stated that at the time G.B. disclosed to her what appellant had done she did not know about A.C.'s disclosure. (Tr. 547). She also testified that G.B. developed a problem with bedwetting when she was approximately four years old, which got better after her disclosure. (Tr. 553).

**{¶65}** Charlotte additionally testified regarding State's Exhibit 2, a photograph of appellant naked. She stated that the photograph was an accurate depiction of appellant while he was taking hormones. (Tr. 550-551). She stated that appellant was taking hormones throughout the time they were living together. (Tr. 550).

**{¶66}** Scott Steele is a child forensic interviewer at Harmony House Children's Advocacy Center. He interviewed G.B. She was seven at the time of the interview. (Tr. 578). The interview was played for the jury. (Tr. 574). Steele testified that G.B. was uncomfortable describing what appellant did to her. (Tr. 578-579). She was willing to circle areas on a picture of where appellant touched her. (Tr. 577-578). G.B. circled the genital area and the buttocks area. (Tr. 578). And when Steele asked her what appellant

used to touch her private area, G.B. circled the mouth on the picture. (Tr. 583-584). She then indicated that appellant used his hand to touch her buttocks. (Tr. 584).

{¶67} Lauren Brown is another forensic interviewer who interviewed G.B. The video of her interview with G.B. was also played for the jury. (Tr. 644-645). During the interview, G.B. disclosed that appellant put his mouth on her vagina and put his finger on her vagina. (Tr. 646). Brown also prepared and submitted a report describing her findings. (Tr. 650).

{¶68} The evidence was overwhelming that appellant sexually abused both girls. Both A.C. and G.B. testified that appellant sexually abused them. And neither girl knew that the other had disclosed abuse. In other words, they disclosed abuse by appellant independently of each other. This bolstered each of their testimonies. Additionally, the nurse who examined A.C. testified that A.C.'s condition was consistent with sexual abuse. And both A.C.'s counselor and her mother corroborated her disclosure. Moreover, the jury viewed the videos of G.B.'s forensic interviews so they were able to view her demeanor as she disclosed the abuse to the interviewers.

{¶69} In sum, even if Spencer offered some expert opinions without submitting an expert report, any error was not plain error and was harmless even if an objection had been lodged in light of the substantial evidence against appellant.

{¶70} Accordingly, appellant's second assignment of error is without merit and is overruled.

{¶71} Appellant's third assignment of error states:

JOSHUA CARPENTER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶72} Here appellant asserts his trial counsel was ineffective in four ways. We will examine each allegation of ineffectiveness in turn.

{¶73} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second,

appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶74}** Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

**{¶75}** First, appellant argues his counsel was ineffective for failing to challenge Juror C. as being biased in favor of the prosecution. He asserts his counsel should have challenged Juror C. for cause, or at least used a peremptory challenge to strike him from the jury. Instead, appellant asserts, counsel used his peremptory challenges on less-objectionable jurors. Appellant focuses on Juror C.'s statements that he tended to believe children over adults and he might not be able to follow the law if appellant did not testify.

**{¶76}** "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.' (Emphasis added.)" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001). Appellant has pointed to no evidence of actual bias here.

**{¶77}** Moreover, appellant's arguments that the prospective jurors his counsel did dismiss were less objectionable than Juror C. is unfounded. Counsel exercised his peremptory challenges to dismiss Jurors H., N., W., and O. (Tr. 167, 178, 185, 195).

**{¶78}** Juror H. is a first-grade classroom aide and a mandatory reporter. (Tr. 107-108). She stated that she believed appellant must have done something or he would not be having a trial. (Tr. 97).

**{¶79}** Juror N. coaches volleyball and Girl Scouts. (Tr. 109-110). She stated that she was afraid she would have a tendency to believe children simply because they are children. (Tr. 90). She also has three young children and believed children tended to be more honest than adults. (Tr. 91).

**{¶80}** In response to the questions, if the state did not meet its burden of proof, could she return a not guilty verdict, Juror W. stated that she would try her best. (Tr. 104-105). When questioned further, she stated that she "just love[s] kids." (Tr. 106).

**{¶81}** Juror O. stated that she thought it might be more difficult to be impartial because children were involved in this case. (Tr. 85-86). Juror O. also stated that she was afraid she would cry throughout the trial because she is very emotional when it comes to a child. (Tr. 89).

**{¶82}** And appellant's counsel did successfully challenge other jurors for cause. Counsel challenged Juror C.C., who indicated she could not listen to the evidence and make a decision based solely on what she heard. (Tr. 113-116). The court dismissed her. (Tr. 117). Counsel also successfully challenged Juror P., who had concerns about her ability to give appellant a fair trial. (Tr. 203-206).

**{¶83}** An appellate court will not second-guess trial strategy decisions such as those made in voir dire. *State v. Cornwell*, 86 Ohio St.3d 560, 569, 1999-Ohio-125, 715 N.E.2d 1144. Appellant's counsel challenged numerous jurors who he thought might be biased or could not give appellant a fair trial. We will not second-guess counsel's decisions as to which jurors to keep and which jurors to challenge.

**{¶84}** Second, appellant argues his counsel was ineffective for failing to object to Spencer's expert testimony, which she offered without providing appellant with an expert report. He contends there was no strategic reason for his counsel to allow the jury to hear Spencer's opinions when her testimony could have been precluded all together.

**{¶85}** As discussed in appellant's second assignment of error, even though Spencer offered some expert opinions without submitting a report, any error in admitting her testimony was harmless error in light of the overwhelming evidence against appellant.

**{¶86}** Third, appellant argues his counsel was ineffective for failing to conduct voir dire examination of the jurors regarding any potential transgender bias. He points out that his transgender status was brought up throughout his trial. Appellant contends his counsel should have inquired during voir dire about the jurors' attitudes towards transgender individuals. In support, he cites to various studies claiming that transgender individuals are discriminated against or harassed because they are transgender.

**{¶87}** As mentioned above, we will not second-guess voir dire strategy decisions. *Cornwell*, 86 Ohio St.3d at 569. It is entirely reasonable to presume that counsel did not want to call unnecessary attention to appellant's transgender status.

**{¶88}** The Ohio Supreme Court has held that defense counsel does not have to ask any particular questions during voir dire and counsel's decision to ask questions regarding racial prejudice is a choice best left to counsel. *State v. Smith*, 89 Ohio St.3d 323, 327, 2000-Ohio-166, 731 N.E.2d 645. Comparing any potential transgender bias to racial bias, the same would hold true here. Whether to voir dire the jury regarding any potential transgender bias was a strategic decision best left to defense counsel's discretion. Thus, we will not conclude appellant's counsel was ineffective for deciding not to question the jury regarding any transgender bias.

**{¶89}** Finally, appellant argues his counsel was ineffective for failing to request that State's Exhibit 2 be cropped to exclude an irrelevant and inflammatory depiction of him during hormone therapy. A.C. testified that appellant did not have any pubic hair when he was abusing her. The state offered State's Exhibit 2 to corroborate A.C.'s testimony on this point. State's Exhibit 2 shows appellant completely naked, wearing makeup, with a women's hairstyle, and breasts starting to develop from hormone therapy. Appellant argues his counsel should have argued for the photograph to have cropped to display only the area that was relevant to the state's case, in other words, only his male genital area. He argues that for the jury to see him in his "gender fluidity" was prejudicial.

**{¶90}** Counsel's failure to object to admissible evidence does not establish ineffective assistance. *State v. Tyler*, 10th Dist. Franklin No. 05AP-989, 2006-Ohio-6896, ¶ 40.

**{¶91}** "Relevant evidence" is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401. Generally, all relevant evidence is admissible. Evid.R. 402. Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403.

**{¶92}** In this case, State's Exhibit 2 was admissible evidence. It had a tendency to establish that A.C.'s veracity in her testimony regarding appellant. The fact that she knew he did not have any pubic hair helped to establish the truthfulness of her testimony. This was likely not something she would know about appellant unless she had seen it.

Thus, State's Exhibit 2 was admissible unless its probative value was substantially outweighed by the danger of unfair prejudice, as appellant asserts.

**{¶93}** Appellant claims only that his counsel should have requested that the state crop the photograph so that the jury would not see his face and hair looking like a woman and would not see his developing breasts. He does not challenge the relevancy of the photograph. The problem with this argument, however, is twofold as the state suggests. First, without appellant's face in the photograph, questions could easily arise as to whether the photograph was actually of appellant. And second, A.C. testified as to the time frame when appellant was abusing her. The testimony indicated that appellant was living as a woman at that time. Thus, the fact that appellant looked like a woman at the time, corroborated the time period that the abuse occurred.

**{¶94}** Because State's Exhibit 2 was both relevant and admissible, appellant's counsel was not ineffective for failing to object to it. Moreover, as discussed above, the evidence establishing appellant's guilt was substantial. Thus, appellant cannot show the necessary prejudicial effect here.

**{¶95}** Accordingly, appellant's third assignment of error is without merit and is overruled.

**{¶96}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Robb, J., concurs.
D'Apolito, J., concurs.

Case No. 19 MO 0010

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**