[Cite as *State v. Carpenter*, 2022-Ohio-898.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

STATE OF OHIO,

Plaintiff-Respondent-Appellee,

v.

JOSHUA E. CARPENTER,

Defendant-Petitioner-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MO 0002**

---

Criminal Appeal from the
Court of Common Pleas Court of Monroe County, Ohio
Case No. 2018 278

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Andrea K. Boyd,* Assistant Attorney General, Ohio Attorney General's Office, 30 East Broad Street, 23rd Floor, Columbus, Ohio 43215, for Plaintiff-Respondent-Appellee and

*Atty. Addison M. Spriggs,* Assistant State Public Defender, and *Atty. Craig M. Jaquith,* Assistant State Public Defender, Office of the Ohio Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Petitioner-Appellant.

Dated:  March 21, 2022

——————————————

**D'APOLITO, J.**

**{¶1}** Defendant-Petitioner-Appellant, Joshua E. Carpenter, appeals the judgment entry of the Monroe County Court of Common Pleas overruling his Petition to Vacate and Set Aside Convictions and Sentence pursuant to R.C. 2953.21 without a hearing.  Appellant advances a single assignment of error with several subparts, all predicated upon ineffective assistance of counsel.

**{¶2}** First, Appellant challenges his trial counsel's failure to object to the testimony of three witnesses who provided expert testimony, despite the fact that no formal expert reports were provided to defense counsel prior to trial.  Next, Appellant argues that he suffered prejudice as a result of his trial counsel's failure to cross-examine the law enforcement officer that interviewed Appellant, in order to underscore alleged inconsistencies between the actual interview and the officer's testimony.  Finally, Appellant asserts that his counsel was deficient because he failed to offer evidence that another man, B.V., had been previously convicted of molesting one of Appellant's victims, in order to argue that the victim's self-harm was attributable to the sexual abuse by B.V.

**{¶3}** Having reviewed the record and the attachments to the petition, we find that Appellant cannot establish ineffective assistance of counsel, or, in the alternative, that the ineffective assistance resulted in outcome-determinative prejudice.  Accordingly, the judgment entry of the trial court overruling Appellant's petition without a hearing is affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶4}** We summarized the facts in this case in Appellant's direct appeal as follows:

Appellant is married to Tabitha. They have a daughter together, A.C., who was born in 2004.  When A.C. was four years old, appellant began a relationship with Charlotte. Appellant left Tabitha and moved in with Charlotte and her daughter G.B., who was born in 2009. Appellant and Charlotte had a son together in 2011.

Case No. 21 MO 0002

A.C. had regular weekend and summer visitation with appellant at Charlotte's house. A.C. last visited with appellant at Charlotte's house in February 2016. In late 2016, when she was in the sixth grade, A.C. disclosed to her school guidance counselor that appellant had been sexually abusing her since she was five years old.

Appellant broke up with Charlotte and moved in with his new girlfriend, Gina in 2016. G.B. and her brother visited appellant at Gina's house on a few occasions. After a visit in 2016, G.B. returned home to Charlotte with a gash on her side and bruises on her rib cage. G.B.'s brother reported to Charlotte that appellant had whipped G.B. Charlotte did not allow her children any further visitation with appellant after that point. G.B. later disclosed to Charlotte's girlfriend that appellant had sexually abused her.

*State v. Carpenter*, 7th Dist. Monroe No. 19 MO 0010, 2020-Ohio-5295, ¶ 2-4, appeal not allowed, 161 Ohio St.3d 1452, 2021-Ohio-534, 163 N.E.3d 583.

{¶5}     Likewise in Appellant's direct appeal, we summarized the testimony offered at trial as follows:

A.C. testified that appellant began sexually abusing her after he and her mother (Tabitha) split up and appellant moved in with his girlfriend (Charlotte). (Tr. 275). She was five years old at the time and about to start kindergarten. (Tr. 275-276). She described the first time the abuse occurred. (Tr. 276-281). A.C. testified that they were sitting on the bed watching the movie It while Charlotte was grocery shopping. (Tr. 276-277). Appellant removed her pants and his own pants. (Tr. 278-279). A.C. stated that appellant then vaginally raped her. (Tr. 279-280). She stated that it "hurt incredibly awful" and she asked him to stop but he did not. (Tr. 280-281). When it was over, appellant told A.C. not to tell anyone. (Tr. 282).

A.C. went on to testify that appellant repeatedly raped her whenever she visited him. (Tr. 284-295). The abuse included vaginal and anal rape in

addition to oral sex. (Tr. 295). A.C. testified she never told her mother about the abuse because she was scared. (Tr. 294, 299). She stated that she obeyed appellant because he was her dad. (Tr. 298-299). A.C. testified that the last time appellant raped her was on February 14, 2016, when she was 11 years old. (Tr. 306, 311). She remembered this day because it was the last time she visited appellant at Charlotte's house. (Tr. 306).

A.C. also testified that when she was ten years old, her mother had her see a counselor because she was cutting herself. (Tr. 312). A.C. stated that close to Christmas 2016, she finally disclosed to her school counselor that appellant had been raping her. (Tr. 317). She stated she was going to have to visit appellant over Christmas break and she was trying to put a stop to the abuse. (Tr. 317-318).

A.C. additionally testified about appellant being transgender. She stated that she grew up with appellant being "trans" and that she loved him regardless of the fact that he wanted her to call him "Mom" or "Brittany." (Tr. 324-325).

A.C.'s mother, Tabitha, testified that after she and appellant broke up, A.C. visited with appellant every other weekend. (Tr. 375). A.C.'s visits with appellant continued until third or fourth grade. (Tr. 380). Tabitha noticed marks on A.C.'s arms and came to learn from A.C. that she was cutting herself. (Tr. 381-382). Tabitha also noticed that A.C. did not want to go to visit appellant. (Tr. 383). Tabitha took A.C. to counseling to deal with the cutting. (Tr. 384-385).

Tabitha stated that in December 2016, she received a call from the school counselor. (Tr. 386). She went to A.C.'s school and A.C. then disclosed to her that appellant had been raping her. (Tr. 386). She stated that thereafter she took A.C. for interviews and a checkup. (Tr. 387). Tabitha also stated that after her disclosure, A.C. learned appellant had been abusing G.B. too. (Tr. 390). She testified that A.C. blamed herself and thought that if she

would have come forward sooner she would have been able to spare G.B. from appellant's abuse. (Tr. 390).

A.C.'s school counselor testified that on December 22, 2016, A.C. disclosed to her that appellant had been raping her since she was five. (Tr. 453-454). The counselor stated that A.C. was shaking and in tears and also confided that she was having suicidal thoughts. (Tr. 454). The counselor immediately contacted children's services and Tabitha. (Tr. 455-456). She stated that Tabitha came right away and A.C. then disclosed to her what appellant had done. (Tr. 457).

Retired Police Chief Chuck Hamilton investigated this matter. He interviewed appellant. Chief Hamilton informed appellant of the allegations A.C. had made. (Tr. 618). He asked appellant if he believed A.C. to be a truthful person. (Tr. 618). Appellant responded that she was. (Tr. 618). At no point did appellant call A.C. a liar. (Tr. 622). Chief Hamilton also spoke with A.C. She told the chief that appellant placed his penis in her vagina and that he did so whenever she visited him. (Tr. 627). She indicated that the last time this happened was in February 2016. (Tr. 627).

Megan Dahlheimer is the pediatric nurse practitioner who examined A.C. Dahlheimer testified that it is very common for children to not report sexual abuse immediately. (Tr. 687-688). She stated that A.C.'s physical examination was normal, which is very common in a sexual abuse case. (Tr. 692). This is due in part because A.C.'s exam did not take place until almost a year after the last disclosed incident of abuse. (Tr. 692-693). Dahlheimer also stated that Tabitha had informed her that A.C. began menstruating at age seven. (Tr. 696). Dahlheimer testified that early onset of menstruation can be a sign of sexual abuse. (Tr. 696-697). Additionally, she stated that cutting is a red flag for abuse as is suicidal ideation, which A.C. disclosed to her. (Tr. 698). At the conclusion of her exam, Dahlheimer's diagnosis was consistent for child sexual abuse. (Tr. 702).

G.B. was nine when she testified. (Tr. 411). She testified that appellant touched her in a place he was not supposed to touch her. (Tr. 414). G.B. stated that it happened when her mom was at work. (Tr. 414). She said this occurred when she was in the first or second grade. (Tr. 415). She stated that this would occur on the couch in the living room. (Tr. 421-422). G.B. then elaborated and testified that appellant touched her "pee-pee" with his hands. (Tr. 417). She stated that she told him not to do that because her mom would get really mad but that he did it anyway. (Tr. 417). Appellant then told G.B. not to tell her mom. (Tr. 418). She also testified that appellant put his mouth on her "pee-pee." (Tr. 428-429). G.B. stated that appellant also did these thing[s] when she visited him (after he had moved out of Charlotte's house). (Tr. 432-433). She then finally disclosed to Jamie (her mom's friend) and Charlotte (her mom) what appellant had been doing to her. (Tr. 431). G.B. also testified that she "didn't even know [A.C.] was involved in this" until she heard her mom talking on the phone about the night before the trial. (Tr. 441-442).

G.B. also testified that she had a scar on her side from appellant hitting her with a belt. (Tr. 418). And she testified that appellant would lock her in the basement. (Tr. 419).

Charlotte testified that she began a relationship with appellant in 2010, when G.B. was a year old. (Tr. 516). Appellant moved in with her and the two had a son together in 2011. (Tr. 518). Charlotte stated that A.C. came and stayed with them every other weekend from the time she was five. (Tr. 522). She testified that appellant would care for the children while she was at work. (Tr. 523).

After she and appellant broke up and appellant moved out, Charlotte's girlfriend Jamie moved in with her. (Tr. 544). Charlotte testified that Jamie called her at work to tell her that G.B. had disclosed to her that appellant had been abusing her. (Tr. 543-544). Charlotte then asked G.B. what had

happened and G.B. disclosed the abuse to her. (Tr. 545). Charlotte filed a police report. (Tr. 545). Charlotte stated that at the time G.B. disclosed to her what appellant had done she did not know about A.C.'s disclosure. (Tr. 547). She also testified that G.B. developed a problem with bedwetting when she was approximately four years old, which got better after her disclosure. (Tr. 553).

Charlotte additionally testified regarding State's Exhibit 2, a photograph of appellant naked. She stated that the photograph was an accurate depiction of appellant while he was taking hormones. (Tr. 550-551). She stated that appellant was taking hormones throughout the time they were living together. (Tr. 550).

Scott Steele is a child forensic interviewer at Harmony House Children's Advocacy Center. He interviewed G.B. She was seven at the time of the interview. (Tr. 578). The interview was played for the jury. (Tr. 574). Steele testified that G.B. was uncomfortable describing what appellant did to her. (Tr. 578-579). She was willing to circle areas on a picture of where appellant touched her. (Tr. 577-578). G.B. circled the genital area and the buttocks area. (Tr. 578). And when Steele asked her what appellant used to touch her private area, G.B. circled the mouth on the picture. (Tr. 583-584). She then indicated that appellant used his hand to touch her buttocks. (Tr. 584).

Lauren Brown is another forensic interviewer who interviewed G.B. The video of her interview with G.B. was also played for the jury. (Tr. 644-645). During the interview, G.B. disclosed that appellant put his mouth on her vagina and put his finger on her vagina. (Tr. 646). Brown also prepared and submitted a report describing her findings. (Tr. 650).

*Id.* at ¶ 52-67.

**{¶6}** In Appellant's direct appeal, he asserted both substantive and ineffective assistance of counsel challenges to the admission of the testimony of Pamela Spencer,

a social worker who conducted a forensic interview of A.C. Appellant argued that the state's failure to provide an expert witness report to defense counsel prior to trial constituted a violation of Crim.R. 16(K)[1], and trial counsel's failure to object to the testimony was prejudicial. Appellant asserts the same claim regarding the testimony of Dahlheimer, Brown, and Katherine Doughy, a Pediatric Sexual Assault Nurse Examiner, in his petition. It is important to note that the state provided no report whatsoever from Spencer, but provided written material from Dahlheimer, Brown, and Doughty that provided some insight into their intended testimony, but did not meet the requirements set forth in Crim R. 16(K). The reports at issue in this appeal were not a part of the record on direct appeal, but were attached to the petition.

{¶7} In the direct appeal, we concluded that Appellant suffered no prejudice as a result of the admission of Spencer's testimony due to the overwhelming evidence of his guilt, which included the testimony of Dahlheimer and Brown. We provided the following summary of Spencer's testimony:

> Spencer is a social worker and forensic interviewer at the Stark County Department of Job and Family Services (SCDJFS). She testified that in order to receive her position she earned a bachelor's degree in sociology. (Tr. 466). While employed at SCDJFS, she completed 30 hours of training pertaining to child welfare and forensic interviewing. (Tr. 466-467). This training included multiple classes on forensic interviewing during the course of her employment. (Tr. 468-469).

---

[1] Crim. R. 16(K), captioned, "Expert Witnesses; Reports," reads, in its entirety:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

Spencer then testified regarding her interview with A.C. Spencer stated that while she was talking with A.C., she notice several verbal and non-verbal clues common in children who have been abused. (Tr. 473). She noted A.C. was soft spoken and giggled a little bit. (Tr. 473). She also observed that A.C. appeared embarrassed at times and didn't maintain eye contact. (Tr. 473-474).

Spencer testified that during the interview, A.C. disclosed that appellant touched her inappropriately and vaginally raped her many times over a five-to-six year period. (Tr. 478-479). A.C. told Spencer that she would tell appellant to stop, but he refused. (Tr. 479). She also told Spencer that appellant told her she would be in trouble if she told her mom. (Tr. 479). A.C. denied oral and anal sex to Spencer. (Tr. 481-482). Spencer testified that it was not uncommon for children to later disclose more information over time. (Tr. 482-483). She also testified that A.C. talked about cutting herself and punching herself. (Tr. 488-489). Spencer stated that self-harm is an indicator of sexual abuse. (Tr. 489).

The prosecutor asked Spencer to answer several questions based on her "education," "training," and/or "experience." (Tr. 477, 482, 483). Spencer also testified that her testimony was based on her observations of A.C. and what A.C. told her in addition to her forensic interview training and her education. (Tr. 500).

* * *

The prosecutor asked Spencer if disclosure over time, as opposed to all at the same time, was to be expected based on her "education and your training and your experience." (Tr. 477). The prosecutor followed up by soliciting testimony that Spencer had conducted over one thousand forensic interviews. (Tr. 477).

Case No. 21 MO 0002

Later, Spencer testified that A.C. did not disclose anal or oral sex during her interview. (Tr. 481). The prosecutor then asked her, "is that something that is based on your education and training and experience, would that be inconsistent if she later said that it did happen?" (Tr. 482). To which Spencer replied "no." (Tr. 482).

In discussing how children remember things, the prosecutor asked Spencer, "Do you think that kids based on your education, training and experience, remember things based on other significant events?" (Tr. 483).

*Id.* at ¶ 32-35, 38-40.

## LAW

**{¶8}** Postconviction relief allows a petitioner to collaterally attack his criminal conviction by filing a petition to set aside the judgment, where the petitioner's constitutional rights were denied to such an extent the conviction is rendered void or voidable under the Ohio or United States Constitutions. R.C. 2953.21(A); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph four of the syllabus. A common pleas court may grant relief from a conviction under R.C. 2953.21 et seq., the postconviction statutes, upon proof of a constitutional violation during the proceedings resulting in the conviction. See R.C. 2953.21(A)(1).

**{¶9}** The petitioner bears the initial burden of demonstrating, through the petition and supporting affidavits and the files and records of the case, "substantive grounds for relief." See R.C. 2953.21(C). A postconviction petition presents substantive grounds for relief if it presents a prima facie claim of a constitutional violation. In presenting those claims, the petition must contain factual allegations that cannot be determined by an examination of the trial record. See *State v. Milanovich*, 42 Ohio St.2d 46, 50, 325 N.E.2d 540 (1975).

**{¶10}** In order to resolve a postconviction petition, a trial court has three options:

The first is to deny the petition without hearing, in accordance with the law as set forth in R.C. 2953.21 and the Ohio Supreme Court's decision in *State*

Case No. 21 MO 0002

*v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999). The second is to act on the state's motion for summary judgment by applying the standards set forth in Civ.R. 56. The third is to schedule an evidentiary hearing on [the defendant's] petition, at which time the trial court, as the trier of fact, is authorized to weigh the evidence and enter judgment.

*State v. Paige*, 7th Dist. Mahoning No. 17 MA 0146, 2018-Ohio-2782, ¶ 16.

{¶11} "It is well settled that a court is not required to hold an evidentiary hearing on every petition for postconviction relief." *Id.* at ¶ 17, citing *State ex rel. Jackson v. McMonagle*, 67 Ohio St.3d 450, 619 N.E.2d 1017 (1993); *State v. Jackson*, 64 Ohio St.2d 107, 110, 413 N.E.2d 819 (1980). "[A] trial court properly denies a defendant's petition for postconviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun,* paragraph two of the syllabus. In this analysis, the trial court is limited to weighing the evidence proffered in support of the defendant's petition, and focuses on the evidence proffered in support of the petition, rather than the evidence proffered in the state's response. *See Williams, supra* at ¶ 22.

{¶12} Further, "[a] postconviction petition may also be dismissed without a hearing where the claims are barred by res judicata." *State v. West*, 7th Dist. Jefferson No. 07 JE 26, 2009-Ohio-3347, ¶ 24. Res judicata bars any claim or defense that was raised or could have been raised in an earlier proceeding:

Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*Perry*, 10 Ohio St.2d at 180-181.

{¶13} A trial court properly dismisses a petition for postconviction relief based on

res judicata "when the defendant, represented by new counsel on direct appeal, fails to raise therein the issue of competent trial counsel and the issue could fairly have been determined without resort to evidence outside the record." *State v. Carosiello*, 7th Dist. Columbiana No. 18 CO 0018, 2019-Ohio-2705, ¶ 28, quoting *State v. Sturgill*, 12th Dist. Clermont Nos. CA2014-01-003 and CA2014-07-049, 2014-Ohio-5082, ¶ 13. Evidence presented outside the record must meet some threshold standard of cogency; otherwise it would be too easy to defeat the res judicata bars by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery. *State v. Cope*, 7th Dist. Columbiana No. 19 CO 0029, 2020-Ohio-4716, ¶ 32.

{¶14} Appellate courts review a trial court's ruling on a petition for postconviction relief for abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. Abuse of discretion implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. *State ex rel. Sartini v. Yost*, 96 Ohio St. 3d 37, 2002-Ohio-3317, 770 N.E.2d 584, ¶ 21.

## ASSIGNMENT OF ERROR

**THE TRIAL COURT ABUSED ITS DISCRETION IN DISMISSING [APPELLANT'S] POSTCONVICTION PETITION WITHOUT A HEARING BECAUSE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND EVIDENCE OUTSIDE OF THE TRIAL RECORD WHICH, IF PROVED, WOULD ENTITLE HIM TO RELIEF.**

{¶15} Appellant's petition is predicated upon four alleged instances of ineffective assistance of counsel. To prove an allegation of ineffective assistance of counsel, an appellant must satisfy a two-prong test. First, an appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, an appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient

performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus. In Ohio, a licensed attorney is presumed competent. *Calhoun*, supra, at 289.

I. Expert Testimony

{¶16} Appellant argues that the testimony of three witnesses, Dahlheimer, Brown, and Doughty should not have been admitted due to the failure by the state to provide expert reports summarizing their testimony prior to trial, and further, that Appellant's trial counsel was ineffective due to his failure to object to the testimony. The state contends that Appellant could have challenged the testimony of Dahlheimer, Brown, and Doughty in his direct appeal, just as he challenged the testimony of Spencer. However, the state provided no report whatsoever from Spencer, but provided written material from Dahlheimer, Brown, and Doughty, including curricula vitae, which was not a part of the record on direct appeal. As a consequence, we must examine the written material provided to determine whether trial counsel's failure to object to their testimony constituted ineffective assistance or resulted in outcome-determinative prejudice to Appellant.

{¶17} Pursuant to Evid.R. 702, a witness may testify as an expert if three conditions are met: (1) the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; and (3) the testimony is based on reliable scientific, technical, or other specialized information. "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

{¶18} In 2020, the Ohio Supreme Court found harmless error where expert testimony regarding time of death was admitted in a murder trial despite the fact that the information was excluded from the written report in *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44. More than a year prior to trial, the state provided the

deputy coroner's written autopsy report to the defense. *Id.* at ¶ 38. The report detailed the deputy coroner's findings, which did not include her opinion as to the time of death based on the stomach contents. *Id.*

**{¶19}** The deputy coroner met with defense counsel nineteen days before trial. *Id.* at ¶ 40. At this meeting, based on the findings contained in the autopsy report, she shared her opinion as to the victim's time of death and her opinion that the shape of the abrasion under the victim's chin was consistent with the shape of the buckle on a glove that had been collected from Boaston. *Id.* Defense counsel suggested that the state supply a supplemental report, but the state did not provide one. *Id.*

**{¶20}** At trial, defense counsel moved to exclude the deputy coroner's opinion testimony as to the time of death and the glove-buckle comparisons because the deputy coroner failed to provide a written report summarizing these opinions at least 21 days prior to trial, as required by Crim.R. 16(K), or because she failed to supplement her report following defense counsel's meeting with her. *Id.* at ¶ 41. The trial court overruled the objection and admitted the testimony. *Id.* The court of appeals upheld the trial court's judgment based on the trial court's broad discretion in regulating the admission of evidence and on waiver. *Id.*

**{¶21}** On appeal to the Ohio Supreme Court, Boaston argued the state's failure to supply a written report providing the deputy coroner's opinions and "scientific reasoning" that the victim died within one to two hours after eating and that the bruise under her chin was consistent with Boaston's glove violated Crim.R. 16(K). *Id.* at ¶ 42. The state countered that Crim.R. 16(K) only requires "a written report summarizing 'the expert witness's testimony, findings, analysis, conclusions, or opinions' " and does not require "scientific reasoning." *Id.* at ¶ 43. Alternatively, the state argued that even if it violated Crim.R. 16(K), the rule is subject to the requirements of Crim.R. 52. *Id.* Thus, any error in the admission of an expert opinion not specifically stated in the deputy coroner's written report would only be reversible if the error was prejudicial to Boaston's substantial rights. *Id.*

**{¶22}** The *Boaston* Court began its analysis with Crim.R. 16, noting that the Rule was amended in 2010 "in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial." *Id.* at ¶ 44. As part of the amendment,

Crim.R. 16(K) was adopted, which requires that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial.  *Id.* at ¶ 46.

**{¶23}**  The *Boaston* Court observed, however, that the deputy coroner's unwritten opinions did not affect Boaston's defense strategy, no continuance was requested, and defense counsel thoroughly cross-examined the deputy coroner as to her time-of-death and glove-buckle-analysis opinions. *Id.* at ¶ 50. Thus, no unfair surprise occurred. *Id.*

**{¶24}**  Nonetheless, the Ohio Supreme Court found a violation of the rule:

> The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." (Emphasis added.) Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery not inconsistent with this rule." (Emphasis added.) And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

*Id.* at ¶ 55.

**{¶25}**  However, the *Boaston* Court did not end its analysis there. Having found that the admission of this evidence was error, it considered whether that error was harmless. *Id.* at ¶ 59.  Because Boaston was not prejudiced by the admission of the coroner's testimony, the Court concluded that the evidence was not essential to the state's prosecution. *Id.* at ¶ 64. Of greater consequence, the *Boaston* Court concluded the evidence, in the absence of the offending testimony, overwhelmingly established Boaston's guilt beyond any reasonable doubt.  *Id.* at ¶ 65.

**{¶26}** In Appellant's direct appeal, we likewise concluded that no prejudice resulted from the admission of Spencer's testimony at trial.  We opined:

> The evidence was overwhelming that appellant sexually abused both girls.
> Both A.C. and G.B. testified that appellant sexually abused them. And

neither girl knew that the other had disclosed abuse. In other words, they disclosed abuse by appellant independently of each other. This bolstered each of their testimonies. Additionally, the nurse who examined A.C. [Dahlheimer] testified that A.C.'s condition was consistent with sexual abuse. And both A.C.'s counselor and her mother corroborated her disclosure. Moreover, the jury viewed the videos of G.B.'s forensic interviews so they were able to view her demeanor as she disclosed the abuse to the interviewers.

In sum, even if Spencer offered some expert opinions without submitting an expert report, any error was not plain error and was harmless even if an objection had been lodged in light of the substantial evidence against appellant.

*Carpenter, supra,* at ¶ 68-69.

{¶27} Turning to the evidence at issue in the petition, the state did provide written material from Brown and Dahlheimer, and curricula vitae from Dahlheimer and Doughty, to Appellant's trial counsel on December 12, 2018.  Appellant contends that the written material fell short of the requirements of Civ.R. 16(K) and further, the admission of their testimony resulted in his conviction.

{¶28} Beginning with Brown, who was not qualified as an expert at trial, her report was unorthodox insofar as it did not include any assessment of or findings regarding G.B., but instead, contained a series of citations to various articles on the subject of sexual abuse of children.  Correspondence from Brown to the Attorney General, to which the report is appended, reads, in its entirety:

I received your request for an expert opinion regarding several topics related to sexual abuse of children.  Please see the following information regarding child sexual abuse and cited resources to which I am prepared to provide you with the requested opinion during trial.

(12/10/2018 Letter, p. 1; Petition, Exhibit D.)  Brown provided a one-and-a-half-page letter

summarizing various articles that analyze delayed disclosure by children in sexual abuse cases, particularly when the perpetrator admonishes the child to remain silent, as well as grooming, and the resultant emotional conflict many victims feel toward abusers to whom they are related.

{¶29} Brown's testimony can be divided in three parts. She described her training and responsibilities as a forensic interviewer, she recounted her interview with G.B., and she provided additional testimony regarding the topics referenced in her report, that is, delayed disclosure, threats by the perpetrator to remain silent, grooming, and the emotional conflict experienced by the victim.

{¶30} Brown's report did not contain any conclusions regarding the veracity of G.B.'s disclosure, and Brown did not offer any expert testimony regarding G.B.'s statements. Instead, Brown's testimony focused on the topics in the source material she cited in her letter to explain various aspects of G.B.'s behavior. Accordingly, we find that Appellant was on notice of the testimony that the state intended to illicit from Brown, no violation of Crim. R. 16(K) occurred, and Appellant did not suffer any prejudice as a result of the admission of Brown's testimony at trial.

{¶31} Correspondence from Dahlheimer to the Attorney General, to which her curriculum vitae is attached reads, in its entirety:

> Through my education and training, it has been brought to my attention that
> sexual abuse may be linked to early pubertal onset in children.

{¶32} Despite the limited content of the correspondence attached to Dahlheimer's CV, she offered testimony regarding delayed disclosure by child sexual assault victims, and explained the lack of physical indicators of abuse in A.C.'s forensic exam based on A.C.'s delayed disclosure. She further testified that there are no physical indicators of abuse in 97% of the exams performed on children. (Trial Tr., p. 695.) Dahlheimer testified that suicidal ideation, self-harm, and forced vomiting several times a day are considered indicators of sexual abuse. (*Id.* at 699.) She further testified that disclosure is often delayed due to threats by the perpetrator.

{¶33} Like Brown, Dahlheimer was not qualified as an expert. Unlike Brown, however, Appellant was not provided any notice regarding the majority of Dahlheimer's

testimony, but for her observation that early onset puberty is an indicator of sexual abuse. Dahlheimer was asked, "So based on your education, training and experience, there is a correlation between child sexual abuse and beginning your period early?" Dahlheimer responded, "Yes." (Trial Tr., p. 697.)

**{¶34}** Similarly, Doughty's CV included her education and recent publications, but provided no insight into her testimony at trial. Doughty described her physical examination of G.B., and concluded that G.B. had been the victim of sexual assault by Appellant. Doughty further testified that the absence of physical indicators of sexual assault was common among children who did not immediately report the abuse, and listed typical explanations provided by children for delayed disclosure.

**{¶35}** Based on the content of the written material provided by Dahlheimer and Doughty, we find that Crim.R. 16(K) violations occurred with respect to both expert witnesses, insofar as Appellant received no pre-trial notice of the content of their prospective trial testimony. Nonetheless, we conclude that no prejudice resulted from the statutory violations, as the remaining testimony, particularly from the victims, was compelling and the outcome of the trial would not have changed had Dahlheimer and Doughty's testimony been foreclosed.

**{¶36}** In summary, we find that no rule violation occurred with respect to the admission of Brown's testimony, and that the technical violation of Crim.R. 16(K) that occurred with respect to the expert testimony of Dahlheimer and Doughty did not result in prejudice due to the remaining testimony offered at trial.

## II. Hearsay Exception to Appellant's Statements During the Police Interview

**{¶37}** Next, Appellant contends that his trial counsel was deficient because he failed to cross-examine Chief Hamilton regarding Appellant's denials of the allegations against him during Chief Hamilton's interview. The state contends that Appellant could have raised this argument in his direct appeal, however, Appellant attached a recording of the police interview to his petition, which was not a part of the record on direct appeal.

**{¶38}** Specifically, Appellant challenges Chief Hamilton's assertion during cross examination that Appellant never stated during the interview that A.C. was "a liar." (Appellant's Brf., p. 18.) Appellant argues that he flatly denied any allegations of abuse

Case No. 21 MO 0002

and offered two cogent explanations for A.C.'s allegedly false accusations.

**{¶39}** Appellant argues that "[c]ompetent counsel, during Chief Hamilton's cross-examination, would have used the recording of the [ ] interview to demonstrate to jurors that [Appellant] did contest – at the earliest possible time – the truthfulness of [A.C.'s] allegations." (*Id.*) Had trial counsel elicited the foregoing testimony, Appellant further asserts that the state would have been prevented from stating during closing argument that "[a]t no point did [Appellant] call [A.C.] a liar. At no point." (Trial Tr., p. 948.)

**{¶40}** The state counters that Appellant's denials during the police interview were inadmissible hearsay. The state cites Evid. R. 801, which defines "hearsay," as "a statement, other than one made by the declarant while testifying at the trial [ ], offered in evidence to prove the truth of the matter asserted." However, the Rule excepts out-of-court admissions by a party opponent. The state relied on the foregoing exception in offering Chief Hamilton's testimony that Appellant vouched for A.C.'s truthfulness during the interview, both before and after Appellant was confronted with her allegations against him.

**{¶41}** The following testimony was admitted at trial. Appellant mistakenly believed that he had been summoned to the police station in order to address his failure to pay child support. At the beginning of the interview, Chief Hamilton revealed the allegations of sexual abuse, but withheld the names of Appellant's accusers.

**{¶42}** During the course of the interview, Chief Hamilton asked Appellant if A.C. was a "truthful girl." Appellant responded, "Oh, yeah." Chief Hamilton further inquired, "No problems with lying?" Appellant responded, "Not that I know of." Chief Hamilton next asked Appellant if he thought A.C. had manufactured allegations against another man, who previously confessed to molesting A.C., to which Appellant replied, "I don't see why she would [have]."

**{¶43}** After Chief Hamilton disclosed that A.C. had disclosed that she suffered systematic sexual abuse by Appellant, Chief Hamilton once again asked Appellant if he believed A.C. was truthful. Appellant responded, "for the most part. Kids are kids." As a consequence, Chief Hamilton's correctly testified that Appellant attested to A.C.'s truthfulness both before and after A.C.'s allegations were revealed to him.

**{¶44}** When Chief Hamilton asked Appellant to suggest a motive for A.C. to

fabricate the allegations against him, Appellant speculated that A.C. may have resented him for "not [being] in the picture," and for being transgender. Appellant then conceded his own bewilderment at A.C.'s allegations, stating "I know I never messed around with any kid, period."

**{¶45}** At the conclusion of the interview, Appellant stated, "This is all some crazy shit. Here I thought I was just talking child support. I know Jamie said some shit over the last couple years. I thought it was just Jamie being a bitch." When Chief Hamilton explained that the charges were "serious enough to incarcerate [Appellant] for the rest of [his] life," Appellant responded, "That's crazy for something I didn't even do." Appellant described his state of mind as "shocked" and "blown away." His final statement at the interview was "I know I didn't do nothing [sic] along those lines. I know I didn't do shit."

**{¶46}** During Appellant's direct testimony, he conceded that he described A.C. as a truthful child at the beginning of the interview, but denied making a similar statement after A.C. was revealed as one of his accusers. Appellant testified that he told Chief Hamilton that A.C. manufactured the allegations, because he "never did them." (Trial Tr., p. 841.) On cross-examination, Appellant could not recall saying, "kids are kids" during the interview. (*Id.*, p. 852-853.)

**{¶47}** Further, Appellant testified that Charlotte had accused him of molesting A.C., G.B., their son, and Appellant's niece in 2016. During the police interview, Appellant stated that Jamie, Charlotte's girlfriend, made accusations in the past, not Charlotte. According to Appellant's trial testimony, he threatened to seek sole custody of his son, and Charlotte's accusations in 2016 were leveled in order to dissuade him from pursuing a change in custody. On rebuttal, Chief Hamilton testified that Appellant never disclosed any accusations allegedly made by Charlotte in 2016 during the police interview.

**{¶48}** On cross-examination, counsel for the state asked Appellant, "Did you specifically call [A.C.] a liar?" Appellant responded, "I'm not sure of the exact words, but I said I did not do it, and if that's what she is saying, she would be lying." (*Id.*, p. 882-883.)

**{¶49}** Although Chief Hamilton correctly testified that Appellant never described Appellant as a "liar" during the police interview, Chief Hamilton did omit from his testimony Appellant's numerous denials of the charges against him. Contrary to the state's

argument on appeal, Appellant would not have offered excerpts from the police interview to prove the truth of the matter asserted (his innocence), but instead, to contradict Chief Hamilton's testimony that Appellant did not dispute the charges against him. Nonetheless, we find that trial counsel's failure to cross-examine Chief Hamilton regarding Appellant's exculpatory statements made during the police interview did not result in outcome-determinative prejudice. Appellant testified at trial and his testimony regarding his protestations during the police interview were heard by the jury. Moreover, the remaining testimony offered during the trial provided substantial evidence of Appellant's guilt.

III. Applicability of Origin of Disease Exception to Rape Shield Law

{¶50} Finally, Appellant contends that his trial counsel provided ineffective assistance because he did not offer testimony regarding the 2016 conviction of B.V., who entered guilty pleas to two counts of gross sexual imposition committed against A.C. Appellant reasons that A.C's self-harming behavior could have been the result of her sexual abuse by B.V. in the second half of 2014, and that his trial counsel's failure to offer the alternative explanation at trial was prejudicial to his defense, as it bolstered A.C's testimony that she was sexually assaulted by Appellant. The state contends that Appellant could have raised this argument in his direct appeal, however, Appellant attached evidence of B.V.'s conviction to his petition, and the conviction was not a part of the record on direct appeal.

{¶51} Ohio's rape-shield law protects both the accuser and the defendant from the admission of evidence of prior sexual activity. The law is contained in statutes defining the crimes of rape, R.C. 2907.02, and gross sexual imposition, R.C. 2907.05, both of which include the following relevant provision:

> Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the

court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

R.C. 2907.02(D); R.C. 2907.05(E).

{¶52} Last year, the Ohio Supreme Court reiterated in *State v. Jeffries,* 160 Ohio St.3d 300, 2020-Ohio-1539,156 N.E.3d 859, that nonconsensual sexual activity is included in the meaning of "sexual activity" in the rape-shield law, and as a consequence, testimony regarding B.V.'s prior sexual assaults on A.C. would have been inadmissible at Appellant's trial. The rape-shield law does not apply to prior accusations of sexual assault that involve a fabrication of sexual activity, however, there is no allegation that A.C. fabricated B.V.'s crimes.

{¶53} Appellant contends that A.C's self-harming behavior is a mental disease, which falls squarely within the statutory exception for the admissibility of "evidence of the origin of * * * disease." Two Ohio intermediate courts have interpreted the exception for evidence of the origin of disease. In *State v. Burgess*, 162 Ohio App.3d 2091, 2005-Ohio-3747, 833 N.E.2d 352, the trial court admitted the victim's testimony that she had had no other sexual experiences prior to the assault by Burgess, because both Burgess and his victim tested positive for gonorrhea. The Second District rejected Burgess's argument that the prejudicial nature of the victim's testimony outweighed its probative value. *Id.* at ¶ 24. In *State v. Schroeder*, 4th Dist. No. 18CA1077, 2019-Ohio-4136, 147 N.E.3d 1, the Fourth District held that the trial court did not abuse its discretion by excluding evidence of the victim's chlamydia diagnosis under the rape shield law in a prosecution for rape, even though Schroeder did not test positive for chlamydia. Schroeder offered no evidence relating to transmission of chlamydia and chlamydia testing, and the trial court found that the victim's diagnosis suggested that victim had multiple partners and would be useful only in attempting to damage her credibility. *Id.* at ¶ 24.

{¶54} With the foregoing case law in mind, we hold that the statutory exception for the admissibility of "evidence of the origin of * * * disease" is limited to sexually transmitted diseases. The exception was designed to apply where a physical link between the defendant and the victim can be demonstrated through the transmission of

a venereal disease. The link is particularly significant where the victim is under the age of 13. Therefore, we find that A.C.'s abuse by B.V. was inadmissible.

**{¶55}** Moreover, A.C. attributed her self-harm to Appellant's sexual abuse during her direct testimony. A.C. was asked if she was cutting herself because she was "trying to deal with what [her] dad was doing to [her,]" and she responded, "Yeah." (Trial Tr., p. 312-313.) A.C. was then asked, "Was this a way of making yourself feel better?" She responded, "Yeah." (*Id.* at 313.) Accordingly, the testimony provided by the health advocates did not create the inference that A.C.'s self-harm was the result of Appellant's sexual abuse from whole cloth, but instead, merely confirmed that victims of sexual abuse often engage in self-harm.

## CONCLUSION

**{¶56}** In summary, we find that Appellant has failed to carry his initial burden of demonstrating substantive grounds for relief based on ineffective assistance of counsel. Although Appellant established Crim.R. 16(K) violations with respect to the testimony of Dahlheimer and Doughty, he is unable to show that their testimony resulted in outcome-determinative prejudice. The same is true with respect to his trial counsel's failure to cross-examine Chief Hamilton regarding Appellant's denial of the charges against him during the police interview. Finally, testimony regarding B.V.'s prior conviction for sexual abuse of A.C. was inadmissible under the rape shield law, and A.C. specifically testified that she engaged in self-harm as a way of coping with Appellant's sexual abuse. For the foregoing reasons, we find that the trial court did not abuse its discretion in overruling Appellant's petition without a hearing, and the judgment entry of the trial court is affirmed.

Waite, J., concurs.

Robb, J., concurs.

Case No. 21 MO 0002

––––––––––––––––––

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**